[No. B170328. Second Dist., Div. Six. June 29, 2004.]

In re RAMON STEVENS, on Habeas Corpus.

1230

## COUNSEL

Ramon Stevens, in pro. per., for Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Julie L. Garland and Nicholas N. Paul, Deputy Attorneys General, for Respondent.

## OPINION

**GILBERT, P. J.**—A convicted child molester serving a prison sentence is released on parole. A parole condition prohibits his use of computers and the Internet, although his crime did not involve a computer. We conclude this prohibition is unreasonable.

### BACKGROUND

In 1997, Ramon Stevens pled guilty to one count of lewd conduct inflicted upon a child under the age of 14. (Pen. Code, § 288, subd. (a).)[1] Stevens had befriended the victim in a youth program. After his arrest, police seized an album of photographs of naked boys and a video recording of Stevens having sex with an adult male. A search of Stevens's home computer revealed it was not used to download child pornography, to contact the victim, or to commit a crime.

On July 12, 2002, the authorities released Stevens from prison and placed him on parole. A special term of his parole stated: "You shall not possess or have access to computer hardware or software including the internet." Stevens complains that this condition is unreasonable and frustrates his ability to earn a living.

Stevens petitioned the superior court for habeas corpus. He asserted that the condition of parole restricting his Internet use 1) bore no connection to the crime of which he was convicted; 2) related to conduct which is not criminal; and 3) forbade conduct not reasonably related to future criminal acts. (See *People v. Dominguez* (1967) 256 Cal.App.2d 623, 627 [64 Cal.Rptr. 290].) Stevens complained that the restriction on his use of a computer infringes on his right to engage in "compensable employment" as an author and Internet entrepreneur. (See *People v. Burden* (1988) 205 Cal.App.3d 1277, 1281 [253 Cal.Rptr. 130].) He argued that the public is protected because a parole condition prohibits him from contacting anyone under the

---

[1] All statutory references are to the Penal Code unless otherwise stated.

age of 18 years and the authorities may monitor his computer activity through his Internet service provider (ISP), which keeps records of every site its subscribers visit.

The superior court denied the petition. It found that although there was no evidence that Stevens used a computer to commit crime, the parole condition was reasonably related to deter future criminality.

Stevens sought relief from this court. We issued an order to show cause. Thereafter, the Board of Prison Terms (BPT) modified Stevens's special parole condition to allow him limited use of the Internet. He may not use the computer to access pornographic Web sites or communicate with minors.

BPT moved this court to dismiss the petition as moot. It asserts its practices do not flout judicial or parole authorities. (See *Giles v. Horn* (2002) 100 Cal.App.4th 206, 228–229 [123 Cal.Rptr.2d 735].) BPT argues that conditions of parole are case specific and, as such, do not lend themselves to be reviewed in moot cases. Stevens's parole agent attests that there is no blanket policy that prohibits parolees from using the Internet.

## DISCUSSION

### 1. *Mootness*

Review of a moot issue is appropriate where it is "of great public import and transcend[s] the concerns of these particular parties." (*Beilenson v. Superior Court* (1996) 44 Cal. App.4th 944, 949 [52 Cal.Rptr.2d 357].) Even when moot, a novel question of continuing public interest is often deserving of consideration by an appellate court. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 746–747 [29 Cal.Rptr.2d 804, 872 P.2d 143] [determining the validity of local zoning ordinance was important to orderly planning even though moot]; *John A. v. San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 [187 Cal.Rptr. 472, 654 P.2d 242] [student's readmission to school did not render moot due process issues concerning expulsion].)

That parole restrictions may be case specific does not necessarily affect mootness. This case, however novel, reflects the challenge courts face as they seek to apply traditional principles of law to issues involving cyberspace. There are federal cases speaking to this issue, but as yet no published California opinion dealing with the issue.[2] Each year, more than

---

[2] In *People v. Baird* (2003) 116 Cal.App.4th 1318 [11 Cal.Rptr.3d 392], Division Five of this District recently dealt with the violation of probation by a person who had been convicted of

115,000 parolees are released from our state prisons and are returned into a society increasingly linked to the Internet. (Cal. Dept. of Corrections, County and Region of Parole Data Analysis Unit, Estimates and Analysis Section (May 2003) Ref. No. Misc-5, table 1A, p. 4.) Parole officers must determine what criteria they should use in deciding which parolees will be denied access to the Internet. We trust our decision will provide guidance to parole officers who bear the responsibility of designing effective and reasonable conditions of parole. We therefore deny the motion to dismiss.

### 2. *Conditions of Parole: An Overview*

Our Legislature has found that "the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees, including the judicious use of revocation actions, and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge." (§ 3000, subd. (a)(1).) The fundamental goal of parole "is to help individuals reintegrate into society as constructive individuals" (*Morrissey v. Brewer* (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 92 S.Ct. 2593]), " 'to end criminal careers through the rehabilitation of those convicted of crime' " (*People v. Reed* (1994) 23 Cal.App.4th 135, 140 [28 Cal.Rptr.2d 509]) and to become self-supporting.

■ Parolees have fewer constitutional rights than do ordinary persons. (*Morrissey v. Brewer, supra*, 408 U.S. at p. 482.) "Although a parolee is no longer confined in prison[,] his custody status is one which requires and permits supervision and surveillance under restrictions which may not be imposed on members of the public generally." (*People v. Burgener* (1986) 41 Cal.3d 505, 531 [224 Cal.Rptr. 112, 714 P.2d 1251], disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 754, 756 [80 Cal.Rptr.2d 734, 968 P.2d 445]; see also *U. S. v. Knights* (2001) 534 U.S. 112, 119 [151 L.Ed.2d 497, 122 S.Ct. 587].) The state may impose any condition reasonably related to parole supervision. (§ 3053, subd. (a).) The criteria for assessing the constitutionality of conditions of probation also applies to conditions of parole. (*In re Naito* (1986) 186 Cal.App.3d 1656, 1661 [231 Cal.Rptr. 506], citing *People v. Burgener, supra*, 41 Cal.3d at p. 532.) The expectation of privacy is the same whether the search condition is a condition of probation or parole. (*People v. Sanders* (2003) 31 Cal.4th 318, 330 [2 Cal.Rptr.3d 630,

using a computer in an attempt to seduce a minor (§§ 664, 288.2, subd. (b)) and distribution of child pornography (§ 311.2, subd. (d)). As a term of probation, Baird was ordered " 'not [to] associate with and stay away from the internet and all computers.' " (*People v. Baird, supra*, at p. 1320.) The issue on appeal did not concern the validity of this condition, but whether the violation of section 311.2, subdivision (d) could be punished as a felony.

73 P.3d 496].) Conditions of parole typically bar a parolee from having contact with old associates or engaging in past activities; they are designed to prevent the parolee from reverting to a former crime-inducing lifestyle. (*People v. Denne* (1956) 141 Cal.App.2d 499, 508 [297 P.2d 451]; 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 629, p. 827.)

There are, however, limits upon the parole authority's imposition of restrictions. Parole conditions, like conditions of probation, must be reasonable since parolees retain "constitutional protection against arbitrary [and] oppressive official action." (*People v. Thompson* (1967) 252 Cal.App.2d 76, 84 [60 Cal.Rptr. 203].) Conditions of parole must be reasonably related to the compelling state interest of fostering a law-abiding lifestyle in the parolee. (*In re White* (1979) 97 Cal.App.3d 141, 146 [158 Cal.Rptr. 562].) Thus, a condition that bars lawful activity will be upheld only if the prohibited conduct either 1) has a relationship to the crime of which the offender was convicted, or 2) is reasonably related to deter future criminality. (*People v. Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545].)

### 3. *Cyberspace*

The 20th century witnessed the stunning growth of mass communication through the media of radio, television, movies, and telephone. (Bimber, Information and American Democracy: Technology in the Evolution of Political Power (2003) pp. 75–88; Smith, Redeeming the Time (1987) pp. 920–921.) The past decade has borne witness to even more ways in which information is exchanged. "America is reacting, generally, to the omnipresence of cyberspace, [fn. omitted] made possible by the rise of new forms of electronic communication. Specifically, the Internet, now past its nascence, comprises the 'backbone' of American academic, governmental, and economic information systems. [Fn. omitted.]" (Schweiger, *The Path of E-Law: Liberty, Property, and Democracy from the Colonies to the Republic of Cyberia* (1998) 24 Rutgers Computer & Tech. L.J. 223, pp. 224–225.) "Computers and Internet access have become virtually indispensable in the modern world of communications and information gathering." (*U. S. v. Peterson* (2d Cir. 2001) 248 F.3d 79, 83–84.)

In *Hall v. LaRonde* (1997) 56 Cal.App.4th 1342 [66 Cal.Rptr.2d 399], we took note of the important role electronic communications play in business transactions. Electronic communication may establish the necessary minimum contacts in a state to establish jurisdiction over a defendant.

The Supreme Court has characterized the Internet as "a vast library including millions of readily available and indexed publications . . . ." (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 853 [138

L.Ed.2d 874, 117 S.Ct. 2329].) In recent years, the legal profession has been fast drawn to cyberspace. Westlaw and Lexis are basic research tools. Our state superior courts post their dockets and other relevant information on the web. Opinions of the California Supreme Court and Courts of Appeal are available on the Internet within moments of filing. For better or worse, the computer and the Internet have facilitated the writing of this opinion.

A study in 2003, conducted by the Pew Research Center, estimated that there were 200 million users of the Internet in the United States. (Madden, *America's Online Pursuits* (Dec. 12, 2003) Pew Research Center, Internet & Am. Life Project <http://www.pewinternet.org.> [as of June 11, 2004].) The study noted that 63 percent of this nation's adults were using the Internet. (*Ibid.*) As of January of 2004 there are approximately 233.1 million users of the Internet. (*Ashcroft v. American Civil Liberties Union* (2004) __ U.S. __ [159 L.Ed.2d 690, 705, 124 S.Ct. 2783, 2794].)

"Anyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods. These methods are constantly evolving and difficult to categorize precisely. But, as presently constituted, those most relevant to this case are electronic mail (e-mail), automatic mailing list services ('mail exploders,' sometimes referred to as 'listservs'), 'newsgroups,' 'chat rooms,' and the 'World Wide Web.' All of these methods can be used to transmit text; most can transmit sound, pictures, and moving video images. Taken together, these tools constitute a unique medium—known to its users as 'cyberspace'—located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet. [¶] E-mail enables an individual to send an electronic message—generally akin to a note or letter—to another individual or to a group of addressees." (*Reno v. American Civil Liberties Union, supra,* 521 U.S. at p. 851.) "[P]ublic debate is enabled by removing perhaps the most significant cost of human interaction—synchronicity. I can add to your conversation tonight; you can follow it up tomorrow; someone else, the day after." (Lessig, Code and Other Laws of Cyberspace (1999) p. 10 (Lessig).)

■ "With the Internet, the average computer blogger has, in effect, his or her own printing press to reach the world." (*Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 453 [9 Cal.Rptr.3d 257] (conc. & dis. opn. of Sills, J.)[3] Restrictions upon access to the Internet necessarily curtail First Amendment rights. (*Ashcroft v. American Civil Liberties Union, supra,* __

---

[3] Blog: "A Web site (or section of a Web site) where users can post a chronological, up-to-date e-journal entry of their thoughts. Each post usually contains a Web link. Basically, it is an open forum communication tool that, depending on the Web site, is either very individualistic or performs a crucial function for a company." (Jensen, Netlingo the Internet Dictionary (1995–2004) <WWW.Netlingo.com/inframes.cfm> (as of June 11, 2004) see also Davis, *Rants, Rulings, & Recipes* (June 2004) Cal. Lawyer, pp. 22–25.)

U.S. __ [124 S.Ct. 2783]; *Clement v. California Dept. of Corrections* (9th Cir. 2004) 364 F.3d 1148.) "The architecture of the Internet, as it is right now, is perhaps the most important model of free speech since the founding [of the Republic]. Two hundred years after the framers ratified the Constitution, the Net has taught us what the First Amendment means. . . . The model for speech that the framers embraced was the model of the Internet—distributed, noncentralized, fully free and diverse." (Lessig, *supra*, at pp. 167, 185.) "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." (*Reno v. American Civil Liberties Union*, *supra*, 521 U.S. at p. 870.)

### 4. *Child Molesters and the Internet*

 Society has a strong interest in protecting its youth from the harmful effects of obscene material. (*Reno v. American Civil Liberties Union*, *supra*, 521 U.S. at pp. 869–870; *Ginsberg v. State of New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274].) Some child molesters reach their victims through the Internet. (*U. S. v. Zinn* (11th Cir. 2003) 321 F.3d 1084, 1093 [the court found that limited restriction on child pornography offender's Internet usage was reasonably related to legitimate sentencing considerations]; *U. S. v. Paul* (5th Cir. 2001) 274 F.3d 155.) "[Defendant] Paul . . . used the Internet to encourage exploitation of children by seeking out fellow 'boy lovers' and providing them with advice on how to find and obtain access to 'young friends.' Restricting his access to this communication medium clearly serves the dual statutory goals of protecting the public and preventing future criminal activity." (*U. S. v. Paul, supra*, at p. 169.)

In *United States v. Rearden* (9th Cir. 2003) 349 F.3d 608, defendant was convicted of shipping child pornography over the Internet. The Ninth Circuit affirmed the imposition of a probation condition prohibiting the defendant from possessing or using a computer with access to any online service without prior approval of the probation officer, noting that the restriction was "reasonably related to the offense that involved e-mail transmissions of quite graphic child pornography, and to the important goal of deterring him during the period of supervision from reverting to similar conduct, and thus, to rehabilitation and protecting the public." (*Id.* at p. 621.)

In *United States v. Crandon* (3d Cir. 1999) 173 F.3d 122, defendant solicited a minor by e-mail and traveled to the victim's hometown where he engaged in sexual relations with her. He pled guilty to receiving child pornography and was sentenced to 78 months imprisonment and three years of supervised release. (*Id.* at p. 125.) The terms of parole included a special condition directing that defendant "not 'possess, procure, purchase or otherwise obtain access to any form of computer network, bulletin board, Internet,

or exchange format involving computers unless specifically approved by the United States Probation Office.' " (*Ibid.*)

On appeal, it was asserted that the special condition unnecessarily infringed upon defendant's liberty interests and bore no logical relation to his offense. The Third Circuit held that because the defendant "used the Internet as a means to develop an illegal sexual relationship with a young girl over a period of several months[,] . . . the condition of release limiting [the defendant's] Internet access is related to the dual aims of deterring him from recidivism and protecting the public." (*U. S. v. Crandon, supra,* 173 F.3d at pp. 127–128.) The court held that even though this special restriction "may hamper [defendant's] employment opportunities upon release" (*id.* at p. 128), and infringe upon his First Amendment rights, "the restrictions . . . are permissible because the special condition is narrowly tailored and is directly related to deterring [the defendant] and protecting the public. [Citation.]" (*Ibid.*)

■ But "[i]t is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." (*Sable Communications of California, Inc. v. F.C.C.* (1989) 492 U.S. 115, 126 [106 L.Ed.2d 93, 109 S.Ct. 2829].) A state may restrict a constitutional right, but only when narrowly drawn to serve a compelling state interest. (*Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1427 [115 Cal.Rptr.2d 439].) The state's power to inhibit free speech is limited. " '[T]he government may enforce reasonable time, place, and manner regulations as long as the restrictions "are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication." [Citations.]' " (*Gonzales v. Superior Court* (1986) 180 Cal.App.3d 1116, 1125 [226 Cal.Rptr. 164].) "Because laws that attempt to regulate expression 'pose a particular danger of abuse by the State,' [citation], they are carefully scrutinized. [Citation.]" (*Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1083 [47 Cal.Rptr.2d 661]; see also *Ashcroft v. American Civil Liberties Union, supra,* __ U.S. __ [124 S.Ct. at p. 2791].)

The federal Second Circuit has staked out a policy of wide-open access to the Internet regardless of whether a computer was used for the underlying crime. In *Peterson,* defendant was convicted of larceny. He had prior state convictions for incest and accessing adult pornography on his home computer. A condition of probation banned his use of the Internet. (*U. S. v. Peterson, supra,* 248 F.3d at pp. 82–84.) Noting that computers and Internet access are essential to communication and the gathering of information, the Second Circuit ruled the ban unreasonable. (*Id.* at p. 83.)

The defendant in *United States v. Sofsky* (2d Cir 2002) 287 F.3d 122, was convicted of possession of child pornography and, as a condition of probation, he was not allowed access to the Internet. The Second Circuit struck the restriction. The appellate court acknowledged that "access to a computer and the Internet after serving his . . . sentence can facilitate continuation of his electronic receipt of child pornography, but we are more persuaded by the observation in *Peterson* that '[a]lthough a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones.' [Citation.] The same could be said of a prohibition on the use of the mails imposed on a defendant convicted of mail fraud. . . . Although the condition prohibiting Sofsky from accessing a computer or the Internet without his probation officer's approval is reasonably related to the purposes of his sentencing, in light of the nature of his offense, we hold that the condition inflicts a greater deprivation on Sofsky's liberty than is reasonably necessary." (*Id.* at p. 126.)

*United States v. White* (2001) 244 F.3d 1199, reaches a middle ground. Responding to an Internet advertisement posted as part of a sting operation, the defendant in *White* ordered videotapes advertised as containing child pornography. The defendant pled guilty to possessing child pornography and served a two-year sentence. After completing his sentence, defendant twice violated a requirement of his supervised release by consuming alcohol. The district court found him to be in violation of parole and sentenced the defendant to six months' incarceration. As a special condition, the court banned defendant from possessing a computer with access to the Internet. Defendant challenged this special condition, arguing that a "plea to a single count of receiving child pornography which he ordered over the Internet . . . is not 'reasonably related' to prohibiting him from all access to the Internet" (*id.* at p. 1205) and that this "special condition [was] 'greater than necessary' in the equation balancing protection of the public with the goals of sentencing." (*Ibid.*)

The 10th Circuit held that the absolute restriction upon Internet access to be too narrow as well as overbroad. It found the condition potentially too narrow because the terms of the condition were unspecified. For example, the condition did not bar the defendant from accessing the Internet at a library or cyber cafe, but simply enjoined him from owning a computer with such access. The court found the condition potentially too broad because the district court may have intended the word "possess" to restrict usage unrelated to the defendant's underlying crime. From that viewpoint, the sentence was " 'greater than necessary.' " (*U. S. v. White, supra,* 244 F.3d at p. 1205.) The court thus found the restriction "neither reasoned nor reasonable" and remanded the case for clarification on the condition of prohibiting the defendant from owning a computer with Internet access. (*Id.* at p. 1207.)

█ In *United States v. Freeman* (3d Cir. 2003) 316 F.3d 386, 392, the Third Circuit reconsidered its holding in *Crandon* and essentially adopted the 10th Circuit's approach. "There is no need to cut off . . . access to email or benign [I]nternet usage when a more focused restriction . . . can be enforced by unannounced inspections of material stored on [the defendant's] hard drive or removable disks." (*Ibid.*)

### 5. *The Instant Case*

█ Here, BPT was legitimately concerned that a released child molester's unfettered access to a computer might result in criminal conduct. In contrast to cases such as *Crandon*, *Paul* and *Rearden*, the broad prohibition on use of the computer and Internet bore no relation to Stevens's conviction for child molestation and imposed a greater restriction of his rights than was reasonably necessary to accomplish the state's legitimate goal.

BPT, concerned about Stevens's illegitimate use of the Internet, sought to prevent his having any access to cyberspace. One can understand the dilemma BPT faced. "[C]yberspace defies boundaries; it offers unlimited access. '[T]he openness of this architecture means this: That there is no "natural" or simple or "automatic" way to keep people out because there are no natural or real borders that close off access to those who should not have access.' [Citation.]" (*U. S. v. White, supra,* 244 F.3d at p. 1207.)

But BPT's task was less daunting than it appeared to be. A focused restriction could be enforced by unannounced inspections of material stored on Stevens's hard drive or his removable disks. (*U. S. v. Freeman, supra,* 316 F.3d at p. 392.; *U. S. v. Sofsky, supra,* 287 F.3d at pp. 126–127.) BPT might also have explored the implementation of monitoring software which automatically generates an e-mail to the parole officer should the parolee engage in an illegal use of his computer. (See, e.g., McKay, *Guardrails on the Information Superhighway: Supervising Computer Use of the Adjudicated Sex Offender* (2003) 106 W.Va. L.Rev. 203, 242.) Finally, BPT can verify Stevens's Internet usage with a sting operation—surreptitiously inviting him to respond to government-placed Internet ads for pornography. (See *U. S. v. White, supra,* 244 F.3d at p. 1201.)

BPT cannot, of course, monitor every aspect of Stevens's behavior. Other than a prohibition on his use of a computer to access pornographic sites, BPT would most likely be unable to monitor Stevens's use of someone else's computer. But like any other parolee, Stevens's unauthorized use of any computer would be at his own peril.

### Conclusion

As observed by Sir William S. Gilbert, a felon's "capacity for innocent enjoyment is just as great as any honest man's." (Gilbert & Sullivan, Pirates of Penzance (1880) act II.) Rehabilitation of a felon entails integration into society where he or she can be self-supporting. In appropriate cases, access to the Internet assists parolees to become law-abiding citizens.

The order to show cause, having served its purpose, is discharged. Because the parole authority modified its restrictions on Steven's computer and Internet access, we now deny the petition as moot.

Coffee, J., and Perren, J., concurred.

On July 28, 2004, the opinion was modified to read as printed above.